IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


THE NORTHWEST PUBLIC               3:10-CV-685-BR
COMMUNICATIONS COUNCIL,
UNIDENTIFIED PSPs A to Z, and
NPCC MEMBERS:  CENTRAL             OPINION AND ORDER
TELEPHONE, INC.; COMMUNICATION
MANAGEMENT SERVICES, LLC;
DAVEL COMMUNICATIONS a/k/a
PHONETEL TECHNOLOGIES, INC.;
INTERWEST TELECOM SERVICES
CORPORATION; NSC
COMMUNICATIONS PUBLIC
SERVICES CORPORATION;
NATIONAL PAYPHONE SERVICES,
LLC; PACIFIC NORTHWEST
PAYPHONES; PARTNERS IN
COMMUNICATION; T & C
MANAGEMENT, LLC; CORBAN
TECHNOLOGIES, INC.; and VALLEY
PAY PHONES, INC.,

        Plaintiffs,

v.

OREGON PUBLIC UTILITY
COMMISSION, an agency of the
State of Oregon; RAY BAUM, in
his capacity as Commissioner
of PUC; SUSAN ACKERMAN, in her
capacity as Commissioner of
PUC; JOHN SAVAGE, in his
capacity as Commissioner of
PUC; and QWEST CORPORATION,

        Defendants.


1  -  OPINION AND ORDER

**FRANKLIN G. PATRICK**
P.O. Box 231119
Portland, OR 97281
(503) 245-2828

       Attorney for Plaintiffs

**MATTHEW J. DONOHUE**
Oregon Department of Justice
1162 Court Street N.E.
Salem, OR 97301-4096
(503) 947-4700

       Attorneys for PUC Defendants

**LAWRENCE H. REICHMAN**
Perkins Coie, LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
(503) 727-2019

       Attorneys for Defendant Qwest Corporation

**BROWN, Judge.**

This matter comes before the Court on Defendants' Joint Motion (#20) to Dismiss.  For the reasons that follow, the Court **GRANTS** Defendants' Motion and **DISMISSES** this matter.

## GENERAL BACKGROUND

**I.    Regulatory Background.**

In 1996 Congress amended the Federal Communications Act (FCA) of 1934 in part to improve competition in the telecommunications industry in the wake of the breakup of the former AT&T into Bell Operating Companies (BOCs).  *See* 47 U.S.C.

§ 151, *et seq.*  In particular, Congress enacted §§ 201 and 276 of the Act to promote greater competition among payphone service providers (PSPs) and to prevent Local Exchange Carriers (LECs) that were often owners of payphone lines and payphone service providers from discriminating against other PSPs in favor of their own payphone services.  In *Davel Communications, Inc. v. Qwest Corporation*, PSPs and LEC Qwest disputed certain payphone service tariffs charged by Qwest.  460 F.3d 1075 (9th Cir. 2006).  In *Davel* the Ninth Circuit set out the following regulatory background that summarizes the numerous administrative orders issued by the Federal Communications Commission (FCC) in its implementation of the Act:

> Chapter 5 of the Federal Communications Act of 1934 as amended by the 1996 Act regulates the telecommunications industry. 47 U.S.C. § 151 *et seq*.  As a general matter, the Federal Communications Act requires common carriers subject to its provisions to charge only just and reasonable rates, *id.* § 201, and to file their rates for their services with the FCC or, in some cases, with state agencies.  *Id.* § 203.  As part of the 1996 Act's general focus on improving the competitiveness of markets for telecommunications services, § 276 substantially modified the regulatory regime governing the payphone industry by providing, in general terms, that dominant carriers may not subsidize their payphone services from their other telecommunications operations and may not "prefer or discriminate in favor of [their] payphone service[s]" in the rates they charge to competitors.  *Id.* § 276(a). The 1996 Act directs the FCC to issue regulations implementing these provisions, specifying in some detail the mandatory

contents of the regulations.  *Id.* § 276(b).

Pursuant to this directive, the FCC adopted regulations requiring local exchange carriers such as Qwest to set payphone service rates and "unbundled features" rates, including rates for fraud protection, according to the FCC's "new services test" (sometimes "NST").  The new services test requires that rates for those telecommunications services to which it applies be based on the actual cost of providing the service, plus a reasonable amount of the service provider's overhead costs.  The FCC's regulations required local exchange carriers to develop rates for the use of public access lines by intrastate payphone service providers that were compliant with the new services test.  The rates were to be submitted to the utility commissions in the states in the local exchange carriers' territory, which would review and "file" (*i.e.*, approve) the rates.  *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Report and Order, FCC 96-388, 11 F.C.C.R. 20,541 (Sept. 20, 1996); *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Order on Reconsideration*, FCC 96-439, 11 F.C.C.R. 21,233 (Nov. 8, 1996) ¶ 163 ("Order on Recons.")(collectively "Payphone Orders"). Also pursuant to the regulations, local exchange carriers were required to file their "unbundled features" rates with both the state commissions and the FCC for approval. *Order on Recons*. ¶ 163.  The FCC required the local exchange carriers to file the new tariffs for both kinds of rates by January 15, 1997, with an effective date no later than April 15, 1997.  *Id.*

In addition, the Payphone Orders required interexchange carriers, mainly long distance telephone service providers, to pay "dial-around compensation" to payphone

service providers, including Qwest, for calls
carried on the carrier's lines which
originated from one of the provider's pay
telephones.  If, however, the payphone
service provider was also an incumbent local
exchange carrier, as was Qwest, the Payphone
Orders required full compliance with the new
tariff filing requirements, including the
filing of cost-based public access line rates
and fraud protection rates, before the local
exchange carrier could begin collecting
dial-around compensation.

* * *

On April 15, 1997, the FCC issued an
order granting a limited waiver of the new
services test rate-filing requirement.  *In
re Implementation of the Pay Telephone
Reclassification and Compensation Provisions
of the Telecommunications Act of 1996*, *Order*,
DA 97-805, 12 F.C.C.R. 21,370 (Apr. 15, 1997)
("Waiver Order").  Specifically, the Waiver
Order granted an extension until May 19,
1997, for filing intrastate payphone service
rates compliant with the new services test,
while at the same time permitting incumbent
local exchange carriers to begin collecting
dial-around compensation as of April 15,
1997.  *Id.* ¶ 2.  The Waiver Order stated that
the existing rates would continue in effect
from April 15, 1997, until the new, compliant
rates became effective ("the waiver period").
The NST-compliant rates were to be filed with
state utility commissions, which were
required to act on the filed rates "within a
reasonable time."  *Id.* ¶ 19 n.60; *see also
id.* ¶¶ 2, 18-19, 25.  If a local exchange
carrier relied on the waiver, it was required
to reimburse its customers" from April 15,
1997 in situations where the newly [filed]
rates, when effective, are lower than the
existing [filed] rates."  *Id.* ¶¶ 2, 20, 25.
The order emphasized that the waiver was
"limited" and "of brief duration."  *Id.*
¶¶ 21, 23.

460 F.3d at 1081-83 (footnotes omitted).

## II.  Administrative History.

Plaintiff Northwest Public Communications Council (NPCC) is a regional trade organization that represents companies providing public payphone services.  Some of its members, including the named Plaintiffs, purchase payphone services from Defendant Qwest and are generally known as PSPs.

Defendant Oregon Public Utilities Commission (PUC) is an Oregon Agency charged with regulating telecommunications in the State of Oregon.  Defendants Ray Baum, Susan Ackerman, and John Savage are Commissioners of PUC whom Plaintiffs have sued in their official capacities.

Defendant Qwest is a BOC as defined in 47 U.S.C. § 153 and a regulated LEC that owned nearly 80% of the payphone lines in Oregon during the relevant period until it sold its payphone services business in 2004.

Plaintiffs have been pursuing this matter with PUC for nearly 12 years at the administrative level.  At the heart of the dispute at the state level are refunds that Plaintiffs are seeking pursuant to FCC Orders issued in the mid-1990s, including the April 15, 1997, Waiver Order.  The relevant administrative history includes (1) the history of Qwest's payphone tariff rates for Public Access Lines (PALs) and Fraud Protection services (CustomNet) that Qwest charged Plaintiffs and filed with PUC and (2) the procedural history of NPCC's claim filed with PUC in May

2001 (Docket DR 26/UC 600)(Refund Case) against Qwest for refunds of tariffs paid to Qwest allegedly in excess of and not compliant with the federal New Services Test (NST).

**A.   Qwest's Oregon Payphone Tariff Rates.**

In September 2001 PUC concluded an administrative process begun by Qwest to set tariff rates in accordance with the FCA (Docket UT 125) (Rate Case).  The Rate Case facilitated the design of the tariffs, and PUC ultimately adopted certain Qwest tariff rates for payphone services.  In March 2002 NPCC appealed PUC's final rate determination to the Marion County Circuit Court and subsequently appealed that court's decision to uphold the rates to the Oregon Court of Appeals in October 2002.  While the appeal was pending, Qwest filed acknowledgments with PUC that reflected Qwest's reduction of PAL and CustomNet rates.  Qwest contended those reductions were compliant with the FCC orders that the rates were to be set in accordance with the NST.  PUC accepted Qwest's rate filings and made the rates effective for PAL on March 17, 2003, and for CustomNet on August 28, 2003.

In November 2004 the Oregon Court of Appeals issued its decision in *Northwest Public Communications Council v. Public Utilities Commission of Oregon* in which it reversed the Marion County Circuit Court, remanded PUC's initial rate-setting decision, and required PUC to reconsider the payphone services rates in light of the recent FCC orders, including the Wisconsin

7  -  OPINION AND ORDER

Order that clarified the method for applying the NST.  196 Or.
App. 94 (2004).

On October 15, 2007, Qwest and NPCC stipulated the PAL and
CustomNet rates submitted by Qwest and approved by PUC in 2003
were NST-compliant.

On November 15, 2007, PUC adopted that stipulation and
confirmed Qwest's compliance with the NST for PAL and CustomNet
rates.

**B.   The Refund Case.**

In May 2001 NPCC filed a complaint with PUC seeking refunds
of PAL rates that NPCC allegedly paid in excess of the NST-
compliant rates.  In 2004 and 2005 the parties filed
cross-motions for summary judgment with PUC on the issue of
Qwest's refund liability for PAL rates.  In March 2005 an ALJ
held the case in abeyance with the hope that the FCC would issue
additional guidance as to the Waiver Order application.  Because
that guidance was not forthcoming, NPCC moved to lift the
abeyance, PUC granted NPCC's motion, and PUC reactivated the case
on February 5, 2009.  NPCC then moved to amend its complaint to
add its CustomNet rate claims to its claims for PAL refunds.  In
May 2009 PUC denied NPCC's motion to add the CustomNet claims
partly on the ground that those claims were barred by the statute
of limitations because the CustomNet rate claims did not relate
back to the claim for PAL refunds that NPCC had originally

8  -  OPINION AND ORDER

asserted.  On November 16, 2009, NPCC again moved to amend
its complaint to add its claims for CustomNet refunds.  On
February 1, 2010, PUC denied NPCC's motion.  After PUC denied
NPCC's motion for reconsideration, NPCC appealed to the Oregon
Court of Appeals.  The Oregon Court of Appeals dismissed NPCC's
interlocutory appeal on September 9, 2010, because NPCC was not
seeking review of a "final order" as required under Oregon law.

## PROCEDURAL BACKGROUND IN THIS COURT

Plaintiffs filed their Complaint in this Court on June 15,
2010.  Plaintiffs only seek declaratory relief, and, despite the
more than 20-page factual history in the Complaint, the matter
appears to be limited to Plaintiffs' request for review of the
PUC ruling denying Plaintiffs leave to amend their administrative
complaint to include the CustomNet claims.  In their Complaint,
Plaintiffs characterize this action as follows:

> This complaint seeks a review and reversal of
> a determination on May 4, 2009 by the PUC
> that Plaintiffs' claims for refunds based on
> overcharges of CustomNet payphone service
> tariffs are time barred by the two-year
> statute limitations contained in 47 U.S.C.
> § 415 and that CustomNet payphone services
> are not integrally related to the provision
> of PAL payphone services.

Plaintiffs set out three claims in ¶¶ 103-13 of their
Complaint:  (1) PUC erred when it determined the statute of
limitations barred Plaintiffs' CustomNet claims; (2) even if the

9  -  OPINION AND ORDER

statute of limitations had run, it was tolled when PUC adopted

the parties' October 15, 2007, stipulation; and (3) claims

against the individual commissioners in their official

capacities.  Accordingly, Plaintiffs seek the following

declarations from the Court in their Prayer for Relief:

> 1.  Declaring that Plaintiff's CustomNet
>     claims are not time barred; and
> 2.  Declaring that the FCC has determined
>     fraud protection is integrally related
>     to the provision of PAL services and
>     the provision of PAL services without
>     offering fraud protection such as
>     CustomNet would be discriminatory
>     against independent PSPs.

On September 28, 2010, the Court granted the parties' Joint

Motion (#14) to Stay Proceedings.

On November 18, 2010, the Court lifted the stay for the

purpose of resolving Defendants' to-be-filed Motion to Dismiss.

On January 7, 2011, Defendants filed their Joint Motion to

Dismiss.

On May 2, 2011, the Court heard oral argument on Defendants'

Motion and took this matter under advisement.

## STANDARDS

> To survive a motion to dismiss [under Rule
> 12(b)(6)], a complaint must contain
> sufficient factual matter, accepted as true,
> to "state a claim to relief that is plausible
> on its face." [*Bell Atlantic v. Twombly*, 550
> U.S. 554,] 570, 127 S. Ct. 1955.  A claim has
> facial plausibility when the plaintiff pleads
> factual content that allows the court to draw

> the reasonable inference that the defendant
> is liable for the misconduct alleged. *Id.* at
> 556 . . . . The plausibility standard is not
> akin to a "probability requirement," but it
> asks for more than a sheer possibility that a
> defendant has acted unlawfully. *Ibid*. Where
> a complaint pleads facts that are "merely
> consistent with" a defendant's liability, it
> "stops short of the line between possibility
> and plausibility of 'entitlement to relief.'"
> *Id*. at 557, 127 S. Ct. 1955 (brackets
> omitted).

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). *See also Bell Atlantic v. Twombly*, 550 U.S. 554, 555-56 (2007). The court must accept as true the allegations in the complaint and construe them in favor of the plaintiff. *Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1050 n.2 (9th Cir. 2007). "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)(citations omitted). The court's reliance on judicially-noticed documents does not convert a motion to dismiss into a summary-judgment motion. *Intri-Plex*, 499 F.3d at 1052.


**DISCUSSION**

Defendants move to dismiss Plaintiffs' claims on the following grounds: (1) Plaintiffs' claims for declaratory relief against PUC are barred by the Eleventh Amendment to the United States Constitution; (2) the Court should exercise its discretion

to dismiss this matter on the basis of the abstention doctrine set out in *Younger v. Harris*, 401 U.S. 37 (1971); (3) in the alternative to dismissal on the basis of abstention, the Court should exercise its discretion to dismiss Plaintiffs' claims for declaratory relief to discourage forum shopping and to avoid duplicative litigation; and (4) issue preclusion bars Plaintiffs from relitigating the CustomNet claims because the Court concluded in *NPCC v. Qwest*, 3:09-CV-1351-BR (NPCC I), that the CustomNet claims were separate and distinct from the PAL claims and, in any event, were time-barred.

## I.    Eleventh Amendment Immunity.

Defendants contend the Court does not have subject-matter jurisdiction over Plaintiffs' claims against PUC because PUC, as an instrumentality of the State of Oregon, is immune from lawsuits under the Eleventh Amendment.  Plaintiffs, however, contend Congress has abrogated state sovereign immunity under the FCA, and, in any event, the State of Oregon has waived its sovereign immunity with respect to claims under the FCA.

### A.    The Law.

Under the Eleventh Amendment the sovereign is immune to claims against it by its citizens.  U.S. Const. amend XI.  *See Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  Congress, however, may abrogate a state's sovereign immunity under certain circumstances, or, as with other constitutional rights, a state

may voluntarily waive its right to immunity.  *See Lane v. Pena*, 518 U.S. 187, 192-98 (1996).

When acting with valid authority, Congress may abrogate a state's sovereign immunity only by an "unequivocal expression" in the text of the statute of its intent to do so.  *Tennessee*, 541 U.S. at 517-18.  *See also Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73 (2000)(applying this "simple but stringent test").

The test for waiver of sovereign immunity also is a "stringent one."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-78 (1999)(quotation omitted).  Sovereign immunity may not be impliedly or constructively waived, and courts "indulge every reasonable presumption against waiver."  *Id.* at 678-82 (waivers of sovereign immunity must be "unmistakably clear").  Any ambiguity in the waiver of sovereign immunity is construed in favor of immunity.  *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992).

   **B.  Analysis.**

Defendants contend PUC is immune from a lawsuit by Plaintiffs and that its immunity has neither been abrogated by an unequivocal expression of Congress nor waived by an unmistakably clear statement by PUC.

      **1.  Abrogation.**

Defendants contend the FCA does not contain an express or unequivocal abrogation of state sovereign immunity nor does

13 -  OPINION AND ORDER

the FCA reflect an intent to do so.  In any event, Defendants
contend Congress does not have the authority under Article I of
the Commerce Clause to abrogate a state's Eleventh Amendment
immunity to a lawsuit.  *Nevada Dep't Of Human Res. v. Hibbs*, 538
U.S. 721, 727 (2003).

Plaintiffs, in turn, assert the Ninth Circuit's opinion
in *Miranda B. v. Kitzhaber* establishes the Eleventh Amendment
does not bar a lawsuit against PUC in federal court.  328 F.3d
1181 (9th Cir. 2003).  As Defendants point out, however, the
plaintiff's claims in *Miranda B.* were based on Title II of the
Americans with Disabilities Act and Section 504 of the
Rehabilitation Act, and the Ninth Circuit found a valid
abrogation of state sovereign immunity in Title II *and* a valid
waiver by state acceptance of federal funds under the
Rehabilitation Act.  *Id.* at 1185-86.  Thus, *Miranda B.* does not
alter the analysis that the Court must engage in to determine
whether the FCA abrogates PUC's immunity or whether PUC has
waived its immunity.

In addition, Plaintiffs argue Congress abrogated state
sovereign immunity under the FCA because § 276 provides the
requirements of the FCA preempt any inconsistent state
requirements.  Plaintiffs, however, do not cite any authority for
the proposition that preemption of state law by Congress is an
"unequivocal expression" of Congress's intent to abrogate state

14 -  OPINION AND ORDER

sovereign immunity.  In fact, the Supreme Court has held the
opposite:  *e.g.*, that the supremacy of federal law does not by
itself foreclose a state from asserting immunity under the
Eleventh Amendment.  *Alden v. Maine*, 527 U.S. 706, 731-32
(1999)("We reject any contention that substantive federal law by
its own force necessarily overrides the sovereign immunity of the
States.  When a State asserts its immunity to suit, the question
is not the primacy of federal law but the implementation of the
law in a manner consistent with the constitutional sovereignty of
the States.").  Thus, the Court concludes § 276 of the FCA is not
a basis for concluding Congress abrogated state sovereign
immunity.

Plaintiffs also contend the Ninth Circuit's opinion in
*Qwest Corporation v. Arizona Corporation Commission*, 567 F.3d
1109 (9th Cir. 2009), when read in the context of the Supreme
Court's decision in *Verizon Maryland, Inc. v. Public Service
Commission of Maryland*, 535 U.S. 635 (2002), requires the Court
to find Congress abrogated sovereign immunity under circumstances
such as those in this case.  In *Verizon*, however, the Supreme
Court determined on the basis of § 252 of the FCA that a state's
voluntary participation in the arbitration of certain
interconnection agreements between service providers and exchange
carriers subjected the state to federal review of its ultimate
arbitration agreement.  535 U.S. at 643-44 ("Section 252(e)(6)

provides for federal review of an agreement when a state commission 'makes a determination under [§ 252].'").  In *Qwest Corporation* the Ninth Circuit did not consider abrogation but rather resolved the issue of federal preemption of certain aspects of the defendant Arizona Corporation Commission's final arbitration of an interconnection agreement under § 252 of the FCA.  567 F.3d at 1118.  Here Plaintiffs do not seek to challenge any ruling by PUC under § 252; there is not any basis to conclude PUC is arbitrating an interconnection agreement subject to § 252; and, in any event, neither *Verizon* nor *Qwest* supports Plaintiffs' position that Congress unequivocally abrogated state sovereign immunity in the FCA.

### 2.  Waiver.

Defendants also maintain PUC has not made an "unmistakably clear" waiver of its sovereign immunity with respect to its mandatory role to hear complaints against federally-regulated utilities under the FCA.  Defendants contrast that role with a state's voluntary participation in the federal scheme to permit states to arbitrate agreements under § 252.  *See U.S. West Commc'n, Inc. v. TCG Oregon*, 35 F. Supp. 2d 1237, 1245 (D. Or. 1998)(when states voluntarily participate in the arbitration and approval process under § 252 of the Federal Communications Act, their participation is a waiver of sovereign immunity).

16 - OPINION AND ORDER

Plaintiffs, in turn, contend PUC waived its sovereign immunity to a lawsuit by deferring to the FCC's interpretation of the Waiver Order.  Plaintiffs cite a November 23, 2005, PUC letter to the FCC (Pls.' Ex. 3) in support of their position. That letter, however, clearly contradicts Plaintiffs' argument: In the letter PUC states its position that it can, "of course," interpret the Waiver Order itself, but PUC hoped to avoid years of appeal by allowing the FCC time to do so.  In any event, there is not any statement in PUC's November 23, 2005, letter that constitutes a clear and unmistakable waiver of the State of Oregon's sovereign immunity.  Although Plaintiffs concede the letter may not constitute a "formal waiver," Plaintiffs, nevertheless, contend "PUC has at least intended to indicate that it wishes to waive its authority to interpret the Waiver Order." Even if PUC intended to waive its authority to interpret federal law, the waiver of a constitutional right is a formal matter and must be unmistakably clear in the case of sovereign immunity. Plaintiffs have not shown PUC or the State of Oregon made such a waiver.

The Court concludes on this record that Congress has not abrogated state sovereign immunity to lawsuits under the FCA nor has PUC unmistakably waived its Eleventh Amendment immunity. Accordingly, the Court concludes Plaintiffs may not pursue their

claims against PUC.[1]

## II. *Younger* Abstention Doctrine.

As noted, Defendants also maintain the Court should exercise its discretion to abstain from ruling on Plaintiffs' Complaint for declaratory relief and dismiss this matter in its entirety based on the *Younger* Abstention Doctrine.  Specifically, Defendants argue the Court should decline to interfere with the on-going, state-level administrative process by reviewing PUC's decision not to allow NPCC to amend its administrative complaint to include CustomNet claims.  Plaintiffs, in turn, contend the *Younger* Abstention Doctrine does not apply to this matter.

### A.   The Law.

Under principles of comity and federalism, a federal court should not interfere with ongoing state proceedings by granting declaratory or injunctive relief absent extraordinary circumstances.  *Younger v. Harris*, 401 U.S. 37, 43-54 (1971). *See also Samuels v. Mackell*, 401 U.S. 66, 72 (1971).  "Under *Younger* and its progeny, federal courts should abstain from intervening in pending state judicial proceedings out of deference to the interests of comity and federalism."  *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 393 (9th Cir. 1995)(citing *Ohio Civil Rights Comm'n v.*

_____

[1] Defendants do not assert the Eleventh Amendment bars Plaintiffs' claims against Defendants Baum, Ackerman, and Savage, the individual PUC Commissioners.

*Dayton Christian Sch., Inc.*, 477 U.S. 619, 626-27 (1986)).  *See also Younger*, 401 U.S. at 44 (comity is the more "vital consideration").

The Ninth Circuit held the *Younger* Abstention Doctrine applies as follows:

> [A]s the [Supreme] Court framed the question, it is:  *first*, do the type of state hearings at issue constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges.
>
> * * *
>
> So long as challenges to the process by which state judgments are obtained relate to pending state proceedings, "proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand."

*Gilbertson v.* Albright, 381 F.3d 965, 973 (9th Cir. 2004)(emphasis in original)(citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982), and quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987)).  See *also Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003).

"[A]n exception [to the *Younger* Abstention Doctrine] exists if [the state proceedings demonstrate] 'bad faith, harassment, or some other extraordinary circumstances that would make abstention inappropriate.'"  *San Jose Silicon Valley Chamber of Commerce*

19 -  OPINION AND ORDER

*Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1092 (9th Cir. 2008)(quoting *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982)).

**B.    Analysis.**

Defendants assert and Plaintiffs dispute whether the circumstances of the state-level administrative proceeding that is currently pending before PUC satisfy the three-pronged test of the *Younger* Abstention Doctrine.

Although Plaintiffs argue the *Younger* Abstention Doctrine does not apply here because the Supreme Court limited its holding in *Younger* to the context of criminal cases, the Court notes the Supreme Court subsequently extended *Younger* significantly to include civil actions in which the parties seek declaratory relief that would interfere with on-going state proceedings.  *See Samuels*, 401 U.S. at 72.

Plaintiffs also maintain the *Younger* Abstention Doctrine applies only in cases in which the defendant in the state proceeding seeks the assistance of the federal court to avoid some exercise of state power against him, such as in criminal proceedings or bar-disciplinary proceedings.  Here Plaintiff NPCC is also the plaintiff in the administrative proceedings that invoked PUC's jurisdiction to resolve a dispute between NPCC and Qwest concerning refunds allegedly owed by Qwest.  Now Plaintiffs seek relief in this Court from a procedural ruling by PUC and the

refusal by the Oregon Court of Appeals to take an interlocutory appeal.  The Court, however, does not find any authority for the proposition that the Court's application and analysis of the *Younger* Abstention Doctrine should be different based on the posture of the parties; *i.e.*, that there should be a different analysis based on whether a *plaintiff* in an underlying matter seeks relief in federal court from an exercise of state authority in contrast to the routine case in which a *defendant* seeks such relief in federal court.

Although the procedural posture of this case is unusual, the Court concludes the *Younger* Abstention Doctrine applies because the Doctrine's purpose is to assess the propriety of a federal court's intervention in an ongoing state proceeding.  With these principles in mind, the Court must determine whether it is appropriate to grant the declaratory relief sought by Plaintiffs.

**1.   Ongoing State Proceeding.**

As noted, Defendants argue the Court should abstain from ruling on this matter because there is an ongoing state administrative proceeding before PUC that is subject to appellate review by the Oregon Court of Appeals.  *See* Or. Rev. Stat. §§ 183.482(1), 756.610 (subjects contested cases at the administrative level in Oregon to judicial review by the Oregon Court of Appeals).  In fact, as noted, on September 9, 2010, the Oregon Court of Appeals refused to take an interlocutory appeal

21 -  OPINION AND ORDER

by NPCC as to PUC's denial of Plaintiffs' motion to amend their administrative complaint to add CustomNet claims.  The Oregon Court of Appeals concluded it did not have jurisdiction to review the matter because PUC's ruling was not yet a "final order." Defs.' Ex. 1.  According to Defendants, after having been denied an interlocutory appeal in the Oregon courts, Plaintiffs now are determined to undermine that process by seeking relief in this Court.

Plaintiffs, in turn, contend the matter before PUC is not appropriate for abstention because the PUC proceeding is not judicial in nature.  Plaintiffs' argument, however, is contrary to the reality of the PUC proceeding, which has written procedures under the Oregon Administrative Procedures Act and Oregon Rules of Civil Procedure that permit discovery; allow the filing of briefs; permit motion practice, including motions for summary judgment; provide for hearings and govern testimony at such hearings; provide for written orders and opinions to resolve legal issues; and permit judicial review by the Oregon Court of Appeals.  *See* Or. Rev. Stat. Chapter 183; Or. Admin. Rule 860, Chaps. 11-16.  Although Plaintiffs characterize these proceedings as "administrative," such a label does not alter the Court's conclusion that the PUC proceedings are "judicial in nature." *See, e.g.*, *Commc'n* Telesystems Int'l v. Cal. Pub. Util. Comm'n, 196 F.3d 1011, 1016 (9th Cir. 1999)(held a similar proceeding at

22 -  OPINION AND ORDER

the California Public Utilities Commission was an ongoing state judicial proceeding).

At oral argument Plaintiffs also argued there are not any ongoing state proceedings with respect to its CustomNet claims because Plaintiffs have been denied the opportunity to amend their administrative complaint to include such claims.  The Court, however, is not persuaded by this argument.  There is an ongoing state proceeding at PUC concerning refunds allegedly owed by Qwest and others to NPCC and others.  Although NPCC has been denied the right to amend their administrative complaint, that ruling may be appealed at the conclusion of the matter and upon a "final order" by PUC.  Any ruling by this Court to the contrary would affect the ongoing PUC proceeding by forcing PUC to allow Plaintiffs to amend their administrative complaint and to permit NPCC to add claims to the existing proceedings.  Such a ruling would also undermine the Oregon Court of Appeals determination under Oregon administrative law that PUC's ruling cannot be appealed until it is a "final order."

Accordingly, the Court concludes Plaintiffs seek declarations from this Court that would impact ongoing state proceedings at PUC that are judicial in nature.


**2.    Important State Interest.**

Defendants note the Supreme Court has recognized the

23 -  OPINION AND ORDER

"regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365-66 (1989)(*NOPSI*)(quoting *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983)).

Plaintiffs point out that the 1996 amendments to the FCA substantially encroached on state authority to regulate utilities. Plaintiffs contend the states, as a result, no longer have an important interest in regulating utilities, which Plaintiffs contend is not a traditional state "police power." Plaintiffs, however, do not cite any authority to support their position that the states no longer have an interest in regulating public utilities, and the Supreme Court's opinion in *NOPSI* contradicts Plaintiffs' contention.

Defendants argue mere federal regulation in an area of state police power does not deprive the state of an interest in a traditional police power of the state. In *Younger*, for example, the Court held the states retain an important interest in criminal enforcement despite the significant federal regulation of crime.

Similarly, the states retain a significant role in the regulation of public utilities, and the Court does not find any basis to conclude the states do not have an important interest in

the regulation of public utilities merely because Congress
regulates public utilities under its Commerce Clause authority to
ensure fair competition.  Thus, the Court concludes the ongoing
state proceedings at PUC implicate an important state interest.

### 3.    Adequacy of State-Level Proceedings.

Defendants contend the administrative process at PUC
and the judicial review by the Oregon Court of Appeals provide
Plaintiffs with an adequate remedy as to federal claims,
including constitutional claims.  As noted, the Oregon Court of
Appeals has already reviewed the PUC's 2003 determination that
Qwest's filed rates were consistent with federal law and ruled in
favor of NPCC's request for a remand to PUC.  *See N.W. Pub.
Commc'n Council,* 196 Or. App. 94 (2004).  *See also* Or. Rev. Stat.
§§ 183.482(1), 756.610.

Plaintiffs do not argue state remedies are inadequate.
Instead Plaintiffs contend PUC does not have jurisdiction to
resolve the underlying Refund Case.  Plaintiffs, however, do not
cite any authority to support their contention.  As noted, PUC
has asserted jurisdiction over the NPCC claims it is currently
adjudicating.  In addition, the Court pointed out in NPCC I that
NPCC stated in its administrative complaint filed with PUC in May
2001 that "OPUC has jurisdiction over this Complaint under ORS
756.500,756.040, 756-160 through 756.200, OAR 860-013-0015, and
FCC Orders in Docket Nos. CC 96-128 and CC 91-35."  After 12

25 -  OPINION AND ORDER

years of administrative proceedings and ten years of pursuing the
Refund Case with PUC, the Court is not inclined to permit
Plaintiffs to change course now and to assert PUC does not have
jurisdiction.  The Court ruled in NPCC I that Plaintiffs' refund
claims are barred in federal court by the applicable statutes of
limitations.  For this Court to issue a ruling at this stage on
Plaintiffs' assertion that PUC does not have jurisdiction would
impermissibly interfere in the ongoing PUC proceedings and also
potentially leave Plaintiffs without any forum in which to pursue
their refund claims.  The Court, therefore, declines to do so and
concludes the state-level proceedings provide Plaintiffs with an
adequate forum to pursue their federal claims.

        In summary, the Court concludes:  (1) there is an ongoing
state proceeding that is judicial in nature, and the Court's
resolution of Plaintiffs' claims would substantially interfere
with that proceeding; (2) the State has an important interest in
the ongoing proceeding and in its general police powers to
regulate public utilities; and (3) Plaintiffs have an adequate
forum at the state level to pursue their claims and to obtain
appellate review of PUC decisions.  Plaintiffs do not contend and
the Court does not find on this record any evidence of bad faith
on the part of PUC that could trigger an exception to the *Younger*
Abstention Doctrine.

        Accordingly, in the exercise of its discretion, the Court

declines to interfere with the ongoing PUC proceedings by
determining whether Plaintiffs are entitled to amend their
administrative complaint to add CustomNet claims.

**III. Declaratory Relief.**

As an alternative to their position that the *Younger*
Abstention Doctrine should apply, Defendants urge the Court to
exercise its discretion to decline to resolve Plaintiffs' claims,
which are solely for declaratory relief, in order to discourage
Plaintiffs from forum shopping.  Plaintiffs, however, argue the
Court should "address the jurisdictional issue [the Court failed
to reach in NPCC I] by truncating the declaratory relief that now
needs to be determined."  Without citation or further explanation
Plaintiffs contend the Court must accept jurisdiction "when the
Court has concurrent jurisdiction."

The Supreme Court has emphasized the district court's
"unique and substantial" discretion as to the issuance of
declaratory judgments.  *Wilton v. Seven Falls Co.*, 515 U.S. 277,
288 (1995).  "If a district court, in the sound exercise of its
judgment, determines after a complaint is filed that a
declaratory judgment will serve no useful purpose, it cannot be
incumbent upon that court to proceed to the merits before staying
or dismissing the action."  *Id.*  "When there is no actual
controversy, the court has no discretion to decide the case.
When there is an actual controversy and thus jurisdiction, the

exercise of that jurisdiction is discretionary." *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634 (Fed. Cir. 1991).

In *Principal Life Insurance Co. v. Robinson*, the Ninth Circuit set out three factors that courts may consider when deciding whether to exercise their discretion as to a declaratory judgment:

> The *Brillhart* factors are non-exclusive and state that, "[1] ][t]he district court should avoid needless determination of state law issues; [2] ] it should discourage litigants from filing declaratory actions as a means of forum shopping; and [3] ] it should avoid duplicative litigation." *Dizol* 133 F.3d at 1225 (citing *Robsac*, 947 F.2d at 1371-73). "Essentially, the district court 'must balance concerns of judicial administration, comity, and fairness to the litigants.'" *Kearns*, 15 F.3d at 144 (quoting *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1367 (9th Cir. 1991)). We have noted additional and potentially relevant considerations such as:

> > whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

> *Dizol*, 133 F.3d at 1225, n.5 (quoting *Kearns*, 15 F.3d at 145 (J. Garth, concurring)).

394 F.3d 665, 672 (9th Cir. 2005).

On this record, the Court concludes Plaintiffs have an adequate remedy on appeal to the Oregon Court of Appeals for resolving the issue as to whether PUC erred when it declined to permit NPCC to amend its administrative complaint.  A decision by this Court as to that issue would not serve any useful purpose in light of the adequate on-going state proceedings, would resolve only a single issue of law best left to PUC and the Oregon Court of Appeals, and would create duplicative and piecemeal litigation.  The Court, therefore, in the exercise of its discretion and as an alternative to the Court's rationale for abstaining under *Younger* and its progeny, respectfully declines to exercise its jurisdiction over Plaintiffs' claims for declaratory relief.


## **CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motion (#20) to Dismiss and **DISMISSES** this matter in its entirety.

IT IS SO ORDERED.

DATED this 27th day of July, 2011.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge


29 -  OPINION AND ORDER